FEDERAL LAND BANK OF COLUMBIA *v.* HENSON, administrator.

ATKINSON, J. 1. The Civil Code (1910), § 3931, provides rules to determine "who are the heirs at law of a deceased person." The third rule is: "If there are children, or those representing deceased children, the wife shall have a child's part, unless the shares exceed five in number, in which case the wife shall have one-fifth part of the estate. If the wife elects to take her dower, she has no further interest in the realty." The Civil Code (1910), § 5249, provides: "Dower may be barred . . By the election of the widow, within twelve months from the grant of letters testamentary or of administration on the husband's estate, to take a child's part of the real estate in lieu of dower." The foregoing provisions are to be construed together. When so construed as applicable to a case where an intestate has left a widow and child or children and an estate in realty, the widow is entitled, in distribution of the estate, to share in the realty with the child or children, provided within one year from the grant of letters of administration she elects to take a child's part in lieu of dower. *Farmers Banking Co.* v. *Key,* 112 *Ga.* 301 (37 S. E. 447) ; *LaGrange Mills* v. *Kener,* 121 *Ga.* 429 (2) (49 S. E. 300), and cit.; *Rountree* v. *Gaulden,* 128 *Ga.* 737 (58 S. E. 346). The principle has been recognized in *Bird* v. *Dyke,* 158 *Ga.* 81, 84, 85 (122 S. E. 595), and cit.

2. Where a widow is entitled to dower or to a child's part in the real estate of her deceased husband, and she elects to take a child's part in lieu of dower, her election may appear by writing duly signed, filed, and recorded in the office of the ordinary, or it may appear by proof of circumstances sufficient to show that within the time allowed by law she affirmatively made election to take a child's part. *Rountree* v. *Gaulden,* supra; *Sewell* v. *Smith,* 54 *Ga.* 567; *Sloan* v. *Whitaker,* 58 *Ga.* 319. The evidence in this case was sufficient to show prima facie that the widow elected to take a child's part in the real estate left by her husband, within twelve months after grant of letters of administration, as required by law.

3. It is provided in the Civil Code (1910), § 4041, that among the necessary expenses of administration, and to be preferred before all other debts, except as otherwise provided, is the provision for the support of the family, to be ascertained in a manner therein specified. Under this law, if there are no minor children, the widow may obtain a year's support for herself. If there are minor children, it is for their benefit as well as hers. There is nothing in the law which excludes her from taking a child's part if she has a year's support assigned to her. *Cole* v. *Cole,* 135 *Ga.* 19, 21 (68 S. E. 784).

4. Section 4041, supra, and the cognate sections do not provide a limit of time after the death of the husband within which an application for year's support shall be made. Consequently mere lapse of time will not, as matter of law, bar the right to apply for the statutory year's support.

5. Long lapse of time between the death of the husband and the widow's application for year's support may be considered by the ordinary in connection with other facts tending to show that the widow had re-

ceived a support from the estate or had waived it expressly or impliedly. And in passing upon the application the ordinary should give weight to evidence as to such facts in determining the amount to be granted, or whether the application should be wholly refused. *Riddle* v. *Shoupe*, 147 *Ga.* 387 (94 S. E. 236), and cit.; *Blassingame* v. *Rose*, 34 *Ga.* 418; *Wells* v. *Wilder*, 36 *Ga.* 194.

6. A privy in estate to an heir of the deceased husband may in the court of ordinary contest with the widow her right to and the amount of a year's support out of the estate of her deceased husband. *Jones* v. *Cooner*, 137 *Ga.* 681 (74 S. E. 51).

7. The evidence did not demand a finding that the defendant was estopped from asserting her right to a child's part in the estate left by the deceased, or from prosecuting before the court of ordinary her application for a year's support.

8. In the former decision of this case (*Henson* v. *Federal Land Bank of Columbia*, 162 *Ga.* 839, 134 S. E. 923), in referring to the deed from W. T. Rash to Fuller it was said: "This deed could not be set aside and cancelled without making Rash a party. It was material to her defense that the defendant should be allowed to attack the deed and have it canceled, and the general demurrer to the cross-action should not have been sustained." This ruling must be construed as referring to the pleadings in the case as they then stood. The cancellation of the deed would have aided the defendant in establishing her defense wherein she denied that plaintiff was owner of the land. In this view it was material. But cancellation of the deed was not essential to the establishment of her right to a year's support or a child's part in the distribution of the estate, as those could not be defeated by existence of the deed.

9. Considering the issues as to all the grounds of relief as based on the pleadings of the respective parties as amended, the judge did not err in admitting testimony to the effect that, prior to a consummation of the sale to the plaintiff's immediate predecessor, the defendant's husband told the purchaser that he could not buy the property without the defendant's assent, and the purchaser replied that "he could."

10. The court did not err in admitting in evidence the record in the court of ordinary, relating to the appointment of the administrator upon the estate of the deceased husband, over the objection that it was irrelevant.

11. The remark of the court as referred to in the third special ground of the motion for new trial was not error in that it amounted to an expression of opinion upon the facts of the case.

12. The evidence was sufficient to support the verdict, and the judge did not err in refusing a new trial.

*Judgment affirmed. All the Justices concur, except Hill, J., disqualified.*

No. 6376. SEPTEMBER 12, 1928.

Equitable petition. Before Judge Pittman. Gordon superior court. November 5, 1927.

W. E. Rash died in 1910, leaving a widow and one child, W. T. Rash, who was an adult and commonly called Wylie Rash. There

was no administration until January, 1925. The estate consisted of a tract of land containing fifty-five acres, more or less, on which at the time of his death the deceased resided and cultivated a farm. Four months after the grant of the administration the widow made application to have a statutory year's support set apart out of the land. The Federal Land Bank, claiming as a remote grantee of W. T. Rash as sole heir at law of W. E. Rash deceased, instituted an action against the widow, to enjoin her from prosecuting her application for a year's support. The grounds of complaint alleged in the original petition were, first, that plaintiff was absolute owner of the land; second, that the widow was estopped, as against the plaintiff, from asserting a right to a year's support to be set apart out of the land. The alleged grounds of estoppel were (a) that after the death of her husband the defendant continuously remained on the property and received a support therefrom for a period of four years, and then moved away; (b) that at the time she left the property she relinquished control thereof and gave it to her son; (c) that four years thereafter, in 1918, W. T. Rash with full knowledge and consent of the widow executed a bond for title to the property to J. W. Fuller, plaintiff's immediate grantor, who went in possession of the land under the bond for title; (d) that thereafter in 1922 W. T. Rash executed a warranty deed to Fuller in order that Fuller might procure a loan on said property from petitioner, that the defendant knew that the title was being placed in Fuller for the purposes above stated, and allowed the loan to be made without disclosing to petitioner that she claimed any interest in the property. The defendant filed a demurrer; also an answer in which she denied plaintiff's ownership of the land and the alleged grounds of estoppel. The defendant also filed a cross-petition, elaborating her denial of the alleged grounds of estoppel, and praying for cancellation of the bond for title and deed from W. T. Rash to Fuller. The defendant also filed an amendment to her original answer, in which she pleaded defensively all the matters set up in the cross-action, and further alleged that in July, 1925, she exercised and expressed her right of election, as the widow of W. E. Rash, to take a "child's part" of the real estate of W. E. Rash, who left no heir at law except defendant and his son, W. T. Rash. She denied that plaintiff had a loan deed to the property, but alleged that, if it has, it has other described property as security for the debt in which

defendant has no interest, and that plaintiff should be first required, to exhaust such security before resorting to the property involved in this case. The amendment also denied that defendant had misled the plaintiff or had done any act to estop her from asserting her rights in the premises. The court overruled the defendant's general demurrer, and refused to rule upon certain special grounds of demurrer, but sustained the plaintiff's general demurrer to the defendant's cross-action.

The case proceeded to trial, and a verdict was returned in favor of the plaintiff. The defendant's motion for new trial was overruled, and she excepted and assigned error also on the antecedent rulings above mentioned. The judgment of the trial court was reversed (see 162 *Ga.* 839). When the case was returned to the trial court the plaintiff, for the purpose of meeting the grounds of special demurrer, amended its petition by setting out an abstract of title under which it claimed. The abstract of title showed that plaintiff claimed directly under a commissioner's deed executed, in pursuance of a sale to petitioner, based on a judgment of foreclosure, in the United States court, of a loan deed executed in 1922 by Fuller to petitioner. It also showed that Fuller claimed 46 acres of the land under a deed directly from W. T. Rash, executed in 1922 in pursuance of a bond for title executed by Rash in 1918, and the remaining nine acres under a chain of deeds commencing in a deed from W. T. Rash executed in 1918 to J. W. Keefe, and intermediate conveyances extending down to Fuller. The abstract also showed that in 1922, W. T. Rash executed directly to Fuller a deed purporting to convey the said 9 acres. The plaintiff's amendment alleged that the defendant knew of the sales by W. T. Rash to Keefe and Fuller and acquiesced in those sales, and that Keefe and Fuller and those claiming under them down to and including plaintiff held the land openly, notoriously, peaceably, exclusively, uninterruptedly, and adversely for more than 7 years next before the defendant sought to have the same appraised and set apart to her as a year's support from her deceased husband's estate.

The defendant voluntarily dismissed her cross-action, but filed two additional amendments to her answer. One of these amendments alleged that after the death of W. E. Rash, the defendant and her said son W. T. Rash continued to live on the land as members of the same family. After several years defendant married

Mr. Henson, left the home of the son, and went to live with her husband at another place. When she left she agreed with her son that he might live on and have the use of the farm until defendant decided to assert her rights and control the same. It was distinctly understood, however, that defendant was not surrendering or releasing any of her right or title to the property, but was only permitting said Rash to use the property temporarily. Sometime after leaving the home defendant heard through her husband that Rash was trying to sell the place, and Fuller was informed that Rash could not sell it. Defendant did not agree for it to be sold, and always objected to a sale when it was mentioned in her presence. She did not know of any intention of Rash or any one else to borrow money on the land. She did not know that Fuller was expecting to buy the land, except from rumors, and only heard that Fuller was to give his notes for the purchase-price and receive a bond for title. She alleged that while Fuller did live on the place about two years, his possession was under Rash and not as owner. Rash and Fuller were acting collusively and there was no bona fide contract of sale, and if any contract was made it was a sham trade. Rash did not have title, but conceived the idea of borrowing money on it, and used Fuller to assist him, and in September, 1922, he executed to Fuller a deed conveying the land, and on the same day Fuller executed a deed conveying the land to T. H. Lang, and on the same day Lang executed a deed conveying the land back to Rash. At the time of such conveyances no one was in possession of the land, Fuller having some time previously moved to another county and abandoned the place. The effect of the above deeds was to have title to the land remain as it was prior to their execution, and the possession of the land by Rash under defendant's permission could not ripen into a prescriptive title. A prescriptive title did not ripen in favor of Fuller or any of those under whom he claimed prior to his conveyance to plaintiff, because nobody had been in possession of the land prior to that time except Rash and Fuller, and both of them knew that title was in the defendant. She did not hear of any intention to borrow money on the land until sometime after it had been done, and did not do anything or perform any act which misled or caused plaintiff to loan money on the land. She prayed to be allowed to proceed to have a year's support set apart out of the property, and that she be decreed to have title to

a part of the property as "a child's part" in the estate of her deceased husband.

On the trial the plaintiff introduced a deed to the whole tract of 55 acres from J. H. Elrod to W. E. Rash, the deceased, dated November 1, 1901, which was duly recorded. The admissions in the pleadings showed that W. E. Rash died in 1910, in possession of the land, and that he left surviving him only his widow (the defendant) and his adult son W. T. (Wylie) Rash. The plaintiff introduced a written stipulation to the effect that W. T. Rash, in November, 1917, executed a bond for title to Fuller, promising, upon performance of the conditions thereof, to convey 46 acres, being the whole of the 55-acre tract except 9 acres of the east side, and that Fuller went into possession of the land under the bond for title in January, 1918. Plaintiff introduced evidence that shortly before the transaction with Fuller, W. T. Rash had carved out from the entire tract the 9 acres above referred to, which he conveyed to J. W. Keefe, and that Keefe went into possession of the 9 acres shortly before Fuller went into possession of the 46 acres. Plaintiff showed an unbroken chain of deeds to the nine acres of land from Keefe down to Fuller. Plaintiff introduced a warranty deed from W. T. Rash to Fuller, executed in 1922, purporting to convey the said 46 acres described in the bond for title. Plaintiff made a loan of money to Fuller, for which Fuller executed his security deed purporting to convey, in addition to other lands, the whole of the 55-acre tract as security for the loan; also a foreclosure of the security deed in the United States court, and a sale of the property thereunder, and a deed from the commissioner making the sale under the decree of the court to petitioner as purchaser, executed on February 8, 1924, and duly recorded.

Plaintiff also introduced a portion of certain depositions of the defendant, to the effect that immediately after the death of her husband, W. E. Rash, she lived with her son Wylie on the place until she married again about three years later. Wylie was married at the time, and had several children. They all lived together as one family. The estate consisted of the land in dispute, on which was the dwelling and a small amount of personalty and $400 of life-insurance money. The depositions in part follow: "I just lived off the insurance money, I didn't have anything except the house things, like anybody else keeping house I had them. Wylie was

married at that time. We all lived there together on the farm. I just lived there like we always did. . . When I married Mr. Henson we had used up the four hundred dollars insurance. . . Wylie managed the affairs during that time; he operated the farm; we just worked on just the same as before, while Mr. Rash was living. Then I married Mr. Henson and moved away, and left the household goods and the farm in charge of Wylie. . . He remained on the place for several years, up until he sold it to Fuller in 1917. Fuller come into possession of it then when he bought it from Wylie. . . I knew Wylie sold it to Fuller. I knew he was talking about it, and I told him he had better not, because he would not get anything for it, but he actually did I knew; he just gave him bond for title first. . . Wylie always operated the farm and paid taxes on it, as his own I reckon. . . I was destitute of education, and I just let him attend to such as that. . . Wylie talked to me about the time he made the trade to Fuller in 1917; they got up a little kind of mad, you know. I told him I knowed they would never pay it, and not to sell it to Fuller. They got sort of hurt about it, and I told them, I agreed, sort of agreed to do it to keep down trouble. I never would have agreed to it if it had not been for that—if Fuller had paid, come up and done the right thing, but he never done it. I think Fuller was to pay fifteen hundred dollars for that fifty-acre tract. . . I did consent for Wylie to make the bond for title to Fuller, I did not object to it at all, but I was not willing to at all; I made no objection to it all, because they were all hurt about [it], and I told them all right." The witness, on being asked if she had ever informed anybody representing plaintiff about any claim she might have to the property, failed to give an affirmative answer, but stated: "After I married I just thought that Wylie was claiming title to the property; it just went on, and there was nothing said about it." To the question: "You did tell him you intended for him to have it?" the witness answered: "Well, of course, it was very reasonable if I was to; he was the only heir and would get it. . . Wylie used the insurance money for us, paid the little debts and such as that, and in support of me and the family, all together." A. P. Patterson, as a witness for the plaintiff, testified that on a certain occasion when Wylie was being carried to the chain-gang the defendant stated: "I give him that place; now just look where he's at."

On cross-examination witness testified defendant was a hard-working woman and earned more than her board and lodging.

Joe Collier, a witness for the plaintiff, testified: "I remember Fuller going into possession of it. I think at that time Wylie had sold a little piece of the fifty-five acres to Will Keefe, nine acres off of the place down there; and Will went into possession of the nine acres. I am pretty certain that Keefe went into possession of that part of it before Fuller went into possession of the balance." B. Y. Dickey, one of the immediate grantors of the 9 acres, testified that prior to the time he took his deed, having ascertained that there was no administration upon the estate, he went to see the defendant and "asked her if she had any claim for anything on the lands that Wylie had sold over there, and she at that time stated that she did not." Witness also talked to her pending the negotiations for the loan from the plaintiff, and "I told her that day that the loan on this land had been approved to Fuller by the Federal Land Bank, that I didn't know when the money would come, but possibly Wylie might be able to have some funds out of that, if he was lacking funds to defend himself. . . Fuller got the money, the money was paid, W. T. Rash got part of it, and the National Bank got part of it for debts of Wylie."

Plaintiff having closed, the defendant read portions of her former depositions which the plaintiff had failed to read, in which she testified that during the three years she lived on the farm she did not get her support from the farm. She did not know that Fuller was getting a loan on the farm. "If Fuller had gone along and paid for it as he contracted under his bond, it would have been all right, if he had paid me; but I didn't get nothing, and that's what worried me, and I thought surely there was something in law that would help somebody to get a little of their own property. . . It was never my intention or purpose to give it to Fuller; it was not my intention to give it to none of them. I wanted it, of course, to live what time I lived. . . I didn't know a deed was signed by Fuller, or was signed to the Federal Land Bank until it was all over. I did not know a thing in the world about it until it was all over, until the money was all borrowed, and there was a friend told me they borrowed the money, but I didn't think they borrowed it on that place, because there was other places. I never did sign any kind of paper that agreed to it. I did not know Wylie ever signed

anything except that bond for title to Fuller. . . I never have at any time, anywhere, done anything to get anybody to buy the place or to induce them to buy it, I never have on earth; never had any idea of selling it; never named it to nobody, about the selling of the place; I just thought it was there, and with it rented out it would help out, help me. I never have received a nickel, or any other amount of this money from that land, none at all. I haven't received anything from it since I married and left there, no rent, nary thing. . . When I lived there in the house with Wylie I helped the family with work. I worked just like I had before Mr. Rash died, hoed, or done anything that was necessary, hoed cotton, and helped on the farm, picked cotton, just like I did when Mr. Rash was living. We went on just like we did when we were all there."

Defendant was introduced as a witness, and testified: "There was four hundred dollars of insurance money collected after his death. The man come there to pay it to me, and I was sick. . . I told Wylie to get it and pay the doctor's bills, and little debts that we had around, and burial expenses; it nearabout took that insurance to pay them. I lived on the place about three years before I married again, and I worked all the time like I did before Mr. Rash died. I lived very well, just like I always lived, and it come from my work. I worked at anything that come up; if it was washing I done it, and if it was hoeing I done it. I done anything that was to do. Wylie had several small children, and I helped take care of them, done all that I could for them. I didn't receive anything more than my actual work figured, didn't receive anything but a living. I never gave this land to Wylie at no time, never intended to give to him until after I was buried, and then he could have it, he was the only heir, and when I died it belonged to him. When I left there with my second husband there wasn't anything done about the place at all. I just walked off and left. As soon as there was an administrator appointed on my husband's estate I proceeded to secure a year's support, as the law provides. I never told Mr. Fuller, or the Federal Land Bank, or any of its representatives, or any of the alleged purchasers in any of these deeds, either to the nine-acre tract, or the other tract, that I had given that land to Wylie, or that it was all right for him to deed it. I

didn't know a thing about them borrowing from that Land Bank until it was all borrowed and over with. I never had any such conversation with Mr. Dickey as he testified to. I did talk to him about buying his place down there where I lived and rented, but I never told him nothing about Wylie owned this at all. I never named to him that I had agreed for Wylie to sell it, him nor nobody else. I never told Bob Patterson that I had given it to Wylie, or intended to give it to him; never told anybody that. I never did give it to him, and he ain't never asked me for it."

On cross-examination the witness testified: "I testified on the former trial from the witness stand that I agreed for Wylie to sign a bond for title to Fuller to that land out there. I never agreed for him to sell the place until I got the money. I wanted the money for that place, or my part of it. I don't know whether I told that on the other trial. I am living in a house and lot in Sugar Valley, have got possession of it, the same place that Wylie contracted to buy from Mr. Moss; he told me that he would help me pay for it, but that was before he got into this trouble. He didn't buy that place for me about the time he was selling this to Fuller, he bought the place before this Fuller place was sold. I thought I would buy me a place over there when I got the money from Fuller, and he bought the place from Mr. Moss and paid him two hundred and fifty dollars on it. I am living on that place now. I knowed that Fuller moved to that place. I didn't know that Wylie give Fuller a bond for title to the place. I thought he would. I told him he could do that, but I wasn't there." Being re-examined in chief the witness testified: "It was understood that the money was to be paid to me, and I was to sign the land deeds, and the deed never did come to me. I was never called on for the deed. I can't sign my own name, and I was just authorizing him to sign it for me. I didn't authorize him to receive any money. . . I never did get any money, and I never authorized him to sell any of that place to Mr. Dickey either. I didn't know when Fuller moved on the place. I knowed after awhile that he lived there. . . When I lived on the place I sure worked for my living. I hired out and picked cotton. I picked some for Mr. Keefe, and some for Mr. Muse. Besides helping him to pick cotton, I picked cotton and made my own money, just like I always done ever since I have been large enough. When I was strong and able to work I

was willing to work, and I am willing to work yet as far as I am able, but I ain't able to work like I used to be."

Several witnesses testified that the defendant was a hardworking woman and earned money working for wages with other people during the period before her second marriage. Defendant also introduced evidence tending to show that there was no administration on the estate of W. E. Rash until 1925, and that administration was granted in that year, and that within less than a year after the grant of administration defendant served upon the administrator notice of her election as the widow of W. E. Rash to take a child's part in his estate, and also applied to the court of ordinary for a statutory year's support out of the 55-acre tract of land. The defendant also introduced deeds to the land from W. T. Rash to Fuller, and from Fuller to T. H. Lang, and from T. H. Lang to W. T. Rash, all dated September 29, 1922, it being recited in the two last-named deeds that the conveyance was subject to the loan deed to the plaintiff. A verdict was returned for the defendant, and a decree was entered thereon, awarding to the defendant an undivided half interest in the property as a distributee in the estate of her deceased husband, and allowing her to continue prosecution for her year's support in the court of ordinary. The present bill of exceptions assigns error on a judgment overruling the plaintiff's motion for a new trial.

*J. G. B. Erwin,* for plaintiff.

*J. M. Lang* and *Y. A. Henderson,* for defendant.